IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

ROBERT WAYNE CHALFANT,           )
                                 )    Civil No. 4:03-cv-30569-RAW
          Plaintiff,             )
                                 )
vs.                              )
                                 )
TITAN DISTRIBUTION, INC. and     )
TITAN INTERNATIONAL, INC.,       )
                                 )
          Defendants.            )

RULING ON POST-TRIAL MOTIONS:
(1) DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A
MATTER OF LAW, OR MOTION FOR NEW TRIAL;
(2) PLAINTIFF'S F.R.C.P. RULE 59(e) MOTION FOR NEW TRIAL
OR TO AMEND JUDGMENT ON ISSUE OF FRONT PAY; AND
(3) PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES AND EXPENSES

The above post-trial motions [66, 67, 68, 69, 70, 75, 77,

88] are before the Court following hearing. This case came on for

trial before the Court[1] and a jury on June 6, 2005 on plaintiff's

perceived disability claim under the Americans with Disabilities

Act (ADA), 42 U.S.C. § 12100, *et seq*.[2] On June 9, 2005 the jury

returned a verdict in favor of plaintiff Robert Chalfant and

against defendants (jointly referred to in the record as "Titan")

in the amount of $60,000 for back pay and $100,000 in punitive

---

[1] The case was referred to the undersigned for trial and all
further proceedings pursuant to 28 U.S.C. § 636(c).

[2] Chalfant also sued under the parallel provisions of the Iowa
Civil Rights Act (ICRA), Iowa Code ch. 216, *et seq*. Iowa courts
have analyzed ICRA disability discrimination claims under the same
analytical framework as the federal courts under the ADA. Casey's
General Stores, Inc. v. Blackford, 661 N.W.2d 515, 519 (Iowa 2003);
Howell v. Merritt Co., 585 N.W.2d 278, 280-81 (Iowa 1998). It is
therefore not necessary to separately analyze the parallel state
claim.

damages. The jury found no damages for emotional distress. The issue of prospective equitable relief in the form of front pay was submitted to the Court. On July 8, 2005 the Court found Chalfant should receive front pay in the amount of $18,750. A judgment totaling $178,750 was thereupon entered. The above-captioned motions followed.

### TITAN'S POST-TRIAL MOTION

As the Court understands Titan's post-trial motion and supporting brief, Titan makes the following arguments: (1) there was insufficient evidence to support the jury's finding that Titan regarded Chalfant as disabled within the meaning of the ADA; (2) the evidence was insufficient to support the jury's finding that Chalfant could have performed the essential functions of the job of second shift supervisor in the tire and wheel mounting division; (3) the evidence was insufficient to support the jury's finding that Chalfant's physical impairments were a motivating factor in Titan's decision not to hire Chalfant for the second shift supervisor position; (4) Chalfant failed to mitigate his damages; (5) the evidence was insufficient to submit the issue of punitive damages to the jury; and (6) the Court abused its discretion in awarding front pay. It is appropriate to pigeonhole these issues. Items (1), (2), (3) and (5) based on the insufficiency of the evidence seek judgment as a matter of law on the issues described and are cognizable under Fed. R. Civ.

P. 50(b). Item (4) in essence incorporates the argument that the verdict for actual damages is excessive because of Chalfant's alleged failure to mitigate. Titan contends the award should be reduced, presumably through remittitur, relief which can only be granted in the context of a motion for new trial. (Def. Motion ¶ 2). To the extent Titan's attack on the front pay award in Item (6) is based on the argument that if judgment as a matter of law is denied on the merits, the Court should nonetheless reconsider the award of front pay (see Def. Motion ¶ 4), the Court will view the motion as one to alter or amend judgment under the authority of Fed. R. Civ. P. 59(e) as the motion in this regard would involve "reconsideration of matters properly encompassed in a decision on the merits." <u>Osterneck v. Ernst & Whinney</u>, 489 U.S. 169, 174 (1989)(quoting <u>White v. New Hampshire Dept. of Employment Security</u>, 455 U.S. 445, 451 (1982)). The front pay issue in Titan's motion will be addressed together with Chalfant's Rule 59(e) motion on the same subject.

**<u>Judgment as a Matter of Law (JAML) Standard</u>**

As noted, Titan's JAML motion questions the sufficiency of the evidence on the merits or to support punitive damages.[3]

---

[3] In Fed. R. Civ. P. 50 motions made at the conclusion of Chalfant's case in chief and renewed at the close of the evidence, Titan moved for judgment as a matter of law on the general ground that the evidence was legally insufficient to find perceived disability discrimination, and on the specific grounds (1) that it was impossible for Titan to have given Chalfant the job he applied
(continued...)

Where sufficiency of the evidence is the JAML issue, a movant "faces an onerous burden." Reeder-Simco GMC, Inc. v. Volvo GM Heavy Truck Corp., 374 F.3d 701, 707 (8th Cir. 2004)(quoting Inacom Corp. v. Sears, Roebuck & Co., 254 F.3d 683, 689 (8th Cir. 2001)).

> Judgment as a matter of law is proper "[o]nly when there is a complete absence of probative facts to support the conclusion reached" so that no reasonable juror could have found for the nonmoving party.

Henderson v. Simmons Foods, Inc., 217 F.3d 612, 615 (8th Cir. 2000)(quoting Hathaway v. Runyon, 132 F.3d 1214, 1220 (8th Cir. 1997)); see Eich v. Board of Regents for Central Mo. State Univ., 350 F.3d 752, 761 (8th Cir. 2003); Jaros v. LodgeNet Entertainment Corp., 294 F.3d 960, 965 (8th Cir. 2002). "[T]he court must assume as proven all facts that the nonmoving party's evidence tended to show, give [him] the benefit of all reasonable inferences, and assume that all conflicts in the evidence were resolved in [his] favor." Hathaway, 132 F.3d at 1220; see Clark v. Kansas City, Mo. School Dist., 375 F.3d 698, 701 (8th Cir. 2004). What this means then is that Titan must demonstrate that "all the evidence points in its direction and is susceptible of no reasonable interpretation

---

[3](...continued)
for because it was eliminated about two months after the hiring decision was made, see infra at 11, and (2) the testimony of Chalfant's family doctor established he could not have performed the essential functions of the job. Chalfant does not argue failure to preserve any issue for review and the Court has proceeded to consider the merits of Titan's arguments. See Conseco Financial Serv. v. North American Mort., 381 F.3d 811, 821 (8th Cir. 2004).

sustaining" Chalfant's position. <u>Ogden v. Waxworks, Inc.</u>, 214 F.3d 999, 1006 (8th Cir. 2000); <u>see</u> <u>Anderson v. Indep. Sch. Dist.</u>, 357 F.3d 806, 809 (8th Cir. 2004). In considering a JAML motion the court "may not make credibility determinations or weigh the evidence." <u>Garcia v. City of Trenton</u>, 348 F.3d 726, 727 (8th Cir. 2003)(citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000)); <u>see</u> <u>First Union Nat. Bank v. Benham</u>, 423 F.3d 855, 863 (8th Cir. 2005); <u>Anderson</u>, 357 F.3d at 809.

## **Discussion**

1.  <u>Factual Background</u>

In the May 24, 2005 ruling on Titan's motion for summary judgment the Court went to some length in setting out the factual background of this case. <u>Chalfant v. Titan Distribution, et al.</u>, 4:03-cv-30569-RAW, Ruling on Defendants' Motion for Summary Judgment, 2005 WL 1398494 (S.D. Iowa May 24, 2005)("summary judgment ruling"). It is not necessary to repeat the entirety of that background here except as appropriate to address the sufficiency of the evidence issues raised by Titan's post-trial motion. The summary judgment ruling should be viewed in conjunction with this one. The factual description below views the evidence, and the inferences which can reasonably be drawn from the evidence, favorably to Chalfant.

Prior to August 1, 2002 Titan contracted with Quintak, Inc. to perform various services including mounting tires on rims,

and warehousing and distributing tires produced by Titan at its Des Moines, Iowa plant. Chalfant was employed by Quintak and before that had been employed for many years by Quintak's predecessor, DICO. Chalfant became a Quintak supervisor in 1997 and at the time of the events in issue was employed performing work at Titan's plant as the second shift supervisor in the tire and wheel mounting division.

Effective August 1, 2002 Titan decided to perform the work Quintak had been doing. Quintak's employees were told that if they wished to continue to work at the Titan plant they had to apply for employment with Titan. Chalfant applied for the second shift supervisor position he had held with Quintak. He continued to work at the Titan plant until August 8, 2002, though after August 1, 2002 he was temporarily employed, as were the other remaining Quintak employees, by Labor Ready, a temporary employment service company.

The application process involved submitting a written application, an interview with Titan human resources employee Nadis Barucic, and a physical examination by a Titan contract doctor, Dr. Anthony J. Sciorrota. As a part of the written application Chalfant completed a "Voluntary Applicant Identification Survey" in which he checked the "Yes" box indicating he was "Physically Handicapped." Chalfant thought he should respond affirmatively because he did have physical impairments as a result of his extensive medical

history. He had had two prior heart attacks, the second in 1997 following which he had open heart surgery with five bypasses. He had arthritis in his hands, and had had numerous surgeries performed on his right hand, including carpal tunnel surgery. He had also had elbow surgery on one occasion. He had had back surgery twice before, a lumbar fusion as a teenager, and a cervical fusion in the mid-1980's.

Chalfant did not recall much about his interview with Barucic other than that Barucic seemed interested in how much work Chalfant had missed. Chalfant told Barucic he missed perhaps two or three days a year.

When he saw Dr. Sciorrota Chalfant was honest about his health history, truthfully answering the medical questionnaire. He told Dr. Sciorrota about his various surgeries and health problems, all of which were duly noted by Sciorrota in his record of the examination. Chalfant fully and accurately described to Sciorrota what his duties entailed as second shift supervisor. These involved supervising the employees who worked under him, keeping the product moving and getting it out the door in good condition. Chalfant spent most of his time driving a fork lift and typically would not have to do any lifting, though he might on occasion be required to pick up a 50-pound tire.

In his medical examination report Dr. Sciorrota wrote that Chalfant was medically able to work in his current capacity,

which he described as "fork lift driving." Dr. Sciorrota's physical examination comments added that if Chalfant was expected to perform heavy lifting, he (Dr. Sciorrota) would recommend a functional capacity examination as well as documentation from Chalfant's treating physicians. Sciorrota did not specify a lifting restriction.

Dr. Sciorrota saw Chalfant on August 1, 2002. Apparently the results of his examination were communicated to Barucic that same day because Barucic made a note on the top of the employment application dated August 1 which said: "px OK fork lift driving," indicating Chalfant had passed the physical examination and was capable of operating a fork lift. (Ex. 2)

Barucic sent the employment application and the medical records he received from Dr. Sciorrota to his Titan corporate superiors. Precisely when and how he did so is not completely clear from the record, but Barucic testified, in substance, that he either faxed the application and medical records shortly after August 1, 2002 to Titan's corporate human resources manager, Cheryl Luthin, at Titan's Quincy, Illinois headquarters, or delivered the documents to Luthin and/or corporate counsel Cheri Holley on one of their trips to Des Moines.

Luthin distanced herself from the employment decision. While she admitted Barucic faxed information to her from time to time, she could not be sure that the information included

employment applications and she did not think Barucic faxed medical information to her. She thought she may have seen Dr. Sciorrota's medical records a month or two after the fact.

Barucic later made a second note at the top of Chalfant's application: "Not pass px." Barucic testified sometime later someone, he did not remember who, told him Chalfant did not pass the physical and that is when he added the second note. Prior to trial Luthin had also testified in a deposition she did not know who had made the determination Chalfant had not passed his physical. Her testimony changed at trial. Luthin testified corporate counsel Holley made the decision when Luthin and Holley were in Des Moines early in August 2002. She testified she saw Barucic hand Holley some documents, apparently Dr. Sciorrota's records of his examination of Chalfant, whereupon Holley "on the spot"[4] told Luthin Chalfant did not pass the physical and gave Barucic instructions as to what to do. Holley did not testify.

In view of Barucic's trial testimony, and Luthin's deposition testimony, the jury might have found it hard to tell who to believe. It is clear, however, that Titan was aware Chalfant had described himself as handicapped, was aware of Chalfant's health history as noted by Dr. Sciorrota, and gave as the reason for the decision not to hire Chalfant that he had not passed the physical.

---

[4] On examination by Chalfant's counsel Luthin agreed with this description.

That is what Chalfant says he was told by Titan facility engineer
Don Brown, tire mounting manager Jerry Williams to whom Chalfant
reported, and Williams' boss, Craig Warren, when they approached
Chalfant on August 8, 2002 and told him he would have to leave the
plant.[5] That is also what Titan told the Iowa Civil Rights
Commission (ICRC) and the Equal Employment Opportunity Commission
(EEOC) in response to Chalfant's administrative complaints.

In fact, Chalfant had not failed his physical
examination. Dr. Sciorrota had, as noted, recommended a functional
capacity examination if Chalfant was expected to do heavy lifting,
but heavy lifting was not required of a shift supervisor in the
tire and wheel mounting division. Quintak had not had a lifting
requirement, Titan did not have a relevant job description with a
lifting requirement and Chalfant's superiors did not know of any
such requirement. The occasional need to lift a 50-pound tire is
not heavy lifting.

Chalfant did not return to work at the Titan plant after
August 8. He was not hired for the second shift supervisor
position. Jerry Williams had told Chalfant that he was on a list of
employees to be retained by Titan. Titan's letters to the ICRC and

---

[5] Brown had been employed by Titan for about seven years and
had known Chalfant for a long time from their prior employment
together at DICO. Williams was a former Quintak employee retained
by Titan who, as manager of the tire mounting area, supervised
Chalfant. Warren was the former Quintak warehouse manager and was
retained by Titan in essentially the same capacity effective
August 1, 2002. Warren was over Williams.

EEOC indicate Chalfant would have been sent for a physical after having received a conditional offer of employment. Williams and Warren both thought a lot of Chalfant and wanted to keep him employed for Titan. They had the authority to hire Chalfant subject to the physical examination requirement. Chalfant's duties as second shift supervisor were reassigned to another employee. The second shift was eliminated by September 30, 2002. Warren testified that had Chalfant been working when the second shift was eliminated, he would have looked for another job for Chalfant to perform at Titan.

Titan has claimed one reason for the decision not to hire Chalfant was the planned elimination of the second shift. There is some question as to when the decision was made, but on August 8 the elimination of the second shift had not been announced, the job of second shift supervisor remained on the charts, Titan had interviewed Chalfant for the job, the only reason for the hiring decision given by Titan prior to the litigation was that Chalfant had not passed the physical examination, and when he was not hired Chalfant's duties as second shift supervisor were reassigned to another employee.

Chalfant looked for substitute employment and within two months was hired by AMPCO Systems. AMPCO manages parking lots in the city of Des Moines. Chalfant was hired to perform general service duties. His day begins with a security round of the two

multi-story parking lots for which he is responsible. In the evening he cleans up in the lots. In the interim he helps customers change tires, puts air in tires, unlocks cars, fills in for the cashier as needed, and does other miscellaneous jobs. His work entails a lot of walking, up to about five miles a day according to the pedometer he wears, and he does more lifting than he did when he worked for Quintak.

Chalfant's AMPCO wages are about half what they would have been at Titan. After Chalfant obtained employment with AMPCO he stopped looking for other employment. He did so primarily out of concern about his health insurance benefits, which he has at AMPCO though at a higher cost to him than it was at Quintak. When he ceased working for Quintak Chalfant was led to believe he would be eligible for COBRA benefits, but it turned out the insurer had canceled Quintak's insurance plan and COBRA benefits were not available to its former employees. At the time Chalfant was 57 years old, and his wife 66. They were dependent on his employment for health insurance. Chalfant had, as noted, many health problems, and his wife was not in good health. Chalfant testified he is concerned that if he gets another job he might have to wait awhile before he becomes eligible for health insurance benefits. He described the prospect of an interruption in health insurance coverage as one of his biggest fears.

Titan takes issue with the sufficiency of the evidence to establish three elements of Chalfant's ADA claim: that Titan regarded his physical impairments as substantially limiting his ability to work; that Chalfant could have performed the essential functions of the job of second shift supervisor in the tire and mounting division; and that Chalfant's physical impairments were a motivating factor in Titan's decision not to hire him for that job. (See Inst. No. 10). The Court will address these in turn, followed by the other grounds asserted in Titan's motion.

2.   Regarded As Disability

The ADA prohibits discrimination in employment against individuals who, though not actually disabled, are "regarded as" having a disability within the meaning of the ADA. Sutton v. United Airlines, Inc., 527 U.S. 471, 489 (1999).

> "Regarded as" disability can occur in two ways: (1) the employer mistakenly believes that the employee has an impairment (which would substantially limit one or more major life activity), or (2) the employer mistakenly believes that an actual impairment substantially limits one or more major life activity.

Wenzel v. Missouri-American Water Co., 404 F.3d 1038, 1041 (8th Cir. 2005). In this circuit, "working" is considered to be a major life activity. Nuzum v. Ozark Automotive Dist., Inc., ___ F.3d __, ___, 2005 WL 3526707, *4 (8th Cir. Dec. 27, 2005). Substantially limited in the major life activity of working means more than being unable to work, or perceived to be unable to work, at a particular

13

job or narrow range of jobs. <u>Wenzel</u>, 404 F.3d at 1041 (citing <u>Wooten v. Farmland Foods</u>, 58 F.3d 382, 386 (8th Cir. 1995)). "When the major life activity considered to be substantially limited is working, the ADA requires at a minimum that the employee is perceived as unable to work in a broad class of jobs." <u>Ollie v. Titan Tire Corp.</u>, 336 F.3d 680, 685 (8th Cir. 2003); <u>see</u> <u>Sutton</u>, 527 U.S. at 491 (quoting EEOC Regulation 29 C.F.R. § 1630.2(j)(3)(i), substantially limits means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities").

Titan argues the evidence shows no more than that Titan perceived Chalfant as unable to perform the specific job for which he applied, second shift supervisor in the tire and wheel mounting division. Whether the evidence was sufficient to permit the jury to conclude Titan regarded Chalfant's non-limiting impairments from his various medical conditions as rendering him unable to work in a class of jobs or a broad range of jobs as opposed to just the second shift supervisor job is the substantial issue on Titan's Rule 50 motion.

As noted in the summary judgment ruling, it is difficult as a practical matter for an ADA "regarded as" plaintiff whose application for a specific job is denied to establish that the employer had anything other than the specific job in mind. (Ruling

at 15). However, just because the applicant applies for a specific job, or a narrow set of jobs, does not invariably lead to the conclusion that the employer did not regard the applicant as substantially limited in the ability to work in the broader sense contemplated by the statute. If that were the case, absent direct evidence of the employer's perception, this prong of the disability definition would not mean very much. The jury having returned a verdict in favor of Chalfant, the question at this juncture is whether, giving Chalfant the benefit of every reasonable inference which can be drawn from the evidence, the jury could conclude Titan regarded him as significantly restricted in performing a class of jobs or a broad range of jobs in various classes. Having considered the matter again in light of the evidence produced at trial, the Court continues to believe the jury could so find.

The jury could reasonably have found as follows from the trial evidence. Though Chalfant applied only for the second shift supervisor position in which he had been employed by Quintak, his application was part of a process in which Titan was vetting Quintak's former employees for possible employment with Titan. Titan did not have a job description for the shift supervisor job which imposed a strength or lifting requirement, and the job as described by Chalfant, was not particularly physically strenuous. According to Chalfant's vocational expert, Roger Marquardt, Chalfant's job was classified in the occupational literature as

having light to medium strength demands. The job entailed supervision of shift employees and the principal physical activity involved was operation of a fork lift. Titan knew the job did not have significant physical demands.

Titan also knew from Chalfant's application papers that he considered himself to be handicapped as a result of his extensive medical history. Titan was aware of that history from Dr. Sciorrota's examination and the information provided to him by Chalfant as reflected in Dr. Sciorrota's medical records, all of which had been provided to Titan. Titan knew Dr. Sciorrota had cleared Chalfant to operate a fork lift. Though Dr. Sciorrota had recommended a functional capacity examination if heavy lifting was required, heavy lifting was not a part of Chalfant's job. Thus, Chalfant had passed his physical examination as indicated on the first note Barucic wrote on his application. Titan knew he had passed the examination.

Though he had passed the physical and been assured by his supervisor that he was on the list to be hired, Titan, allegedly in the person of its corporate counsel Holley, directed that Chalfant not be hired because he had not passed the physical. As noted, Titan knew that was not true and consequently the jury could have found that was not the true reason for the hiring decision but a pretext for some other reason or reasons. The real reason was related to Chalfant's physical condition, but had to do with

16

Chalfant's history of health problems with his back, heart, hands, elbow and arthritis and the kinds of impairments associated with the conditions noted by Dr. Sciorrota, not a failure to pass the pre-employment physical examination. After all, according to Luthin, Holley rejected Chalfant immediately after having reviewed the medical information from Dr. Sciorrota.

From the facts Chalfant had been medically cleared for the job for which he applied and was otherwise well-qualified, the jury may reasonably have found that the perception Chalfant was unable to work extended beyond the modest physical requirements of the shift supervisor's job to a perception that as a self-described handicapped person with impairments, real or assumed, resulting from numerous medical problems over the years, he was not the kind of worker Titan wanted in its plant. In other words, the jury may have believed Titan saw Chalfant as generally disqualified from work in Titan's manufacturing plant because of his physical impairments, even from a job the company doctor said he could perform. So viewed, the perception could reasonably have been seen by the jury as extending to a broad class of jobs permitting a finding in Chalfant's favor on the "regarded as" element.[6]

---

[6] Vocational expert Marquardt also opined that if Chalfant was perceived as unable to do the medium strength work of a fork lift operator/floor supervisor, he would have lost access to approximately 70% of the jobs defined in the Dictionary of Occupational Titles.

3.   Essential Functions of the Job

Titan argues the evidence is insufficient on the element of Chalfant's ability to perform the essential functions of the second shift supervisor job for three reasons: (1) the job was eliminated by September 30, 2002, hence there were no essential functions because there was no job; (2) the job for Titan would not necessarily have been the same job he performed previously; and (3) the testimony of Chalfant's personal physician, Dr. Jeffrey Schoon, establishes that he could not have performed the essential functions of the job.

The second shift in the tire and wheel mounting division was eliminated by September 30, 2002, but the fact remains the job of shift supervisor was in place until then. Titan was interviewing to fill the second shift supervisor's job, and had Chalfant not been rejected because of his physical impairments he would have been hired.

The Court does not recall any evidence that the functions of the job were going to change materially under Titan from what they had been under Quintak, and Titan does not describe what the difference would have been. Chalfant had performed all of the essential functions of the second shift supervisor job, and performed them well, as an employee of Quintak for about five years before the hiring decision. From this alone the jury could find Chalfant could have performed the essential functions of the job.

18

Chalfant treated with Dr. Jeffrey Schoon, a family practice physician, in 2002, including within about a week after Chalfant was told to leave the plant. Schoon testified that Chalfant's most significant impairment concerning how much he could lift and carry was his generalized osteoarthritis, which he characterized as moderate to severe. Schoon further testified he thought it would be difficult for Chalfant to lift more than five pounds on a regular basis or, except on a rare basis, walk more than a hundred yards up to perhaps half a mile. Schoon performed an informal functional capacity evaluation on Chalfant from which he concluded Chalfant could not lift and carry heavy objects on a frequent basis.

Schoon's testimony was definitely not helpful to Chalfant, but it does not mandate judgment as a matter of law in Titan's favor on the question of whether Chalfant could have performed the essential functions of the second shift supervisor job. The jury was not required to accept Schoon's testimony. As noted, Chalfant had performed the essential functions of the job for about five years. Dr. Sciorrota's report following his evaluation specifically for the purpose of determining whether Chalfant could physically perform the second shift supervisor job was arguably inconsistent with Dr. Schoon's opinions. Dr. Schoon's testimony about Chalfant's inability to do much walking is contradicted by Chalfant's testimony about the extensive walking he

19

has done without difficulty in his current employment. Finally, the jury may have viewed Dr. Schoon's testimony as inconsistent with that of the vocational experts. Indeed Titan's expert, Kathryn Bennett, directly opined that Chalfant could perform the essential functions of a floor supervisor job like that he had performed for Quintak. The jury, of course, had an opportunity to observe Chalfant and  assess the credibility of his testimony that he could perform the requirements of the second shift supervisor job, and his description of the physical demands of his current employment.

There was ample evidence to support the jury's finding that Chalfant could have performed the essential functions of the job of second shift supervisor in the tire and wheel mounting division.

4.   <u>Motivating Factor</u>

Titan argues Chalfant's perceived physical impairments had nothing to do with the decision not to hire him as the second shift supervisor because the second shift was eliminated by September 30, 2002. Again, the only reason given to Chalfant, and later the ICRC and the EEOC, for not hiring him was that he had failed his pre-employment physical examination. Luthin's trial testimony concerning how the decision was made is probative that Chalfant's physical impairments were a motivating factor in the hiring decision. Holley looked at the medical information from

Sciorrota and promptly rejected Chalfant as not physically qualified.

About two months after the hiring decision the second shift was eliminated, but as noted several times now, the job existed when Chalfant applied for it, he was interviewed for the job, he was not hired only because he did not pass the physical examination, and someone else was assigned to perform the duties of the job.

5.   Mitigation

Titan seeks a reduction of the back pay award because Chalfant failed to mitigate his damages. The burden was on Titan to prove Chalfant failed to mitigate his damages. In order to establish this defense, Titan had "to show that the plaintiff failed to use reasonable care and diligence [to seek suitable alternative employment] and that there were jobs available which the plaintiff could have discovered and for which the plaintiff was qualified." Coleman v. City of Omaha, 714 F.2d 804, 808 (8th Cir. 1983); see Hartley v. Dillard's, Inc., 310 F.3d 1054, 1061-62 (8th Cir. 2002).

When the hiring decision put him out of work Chalfant promptly sought other employment and obtained the job with AMPCO. His job with AMPCO is not substantially equivalent work as he currently earns only about half of what he would have been making had he been hired by Titan. After he obtained the AMPCO job

21

Chalfant ceased looking for other employment because he was concerned about an interruption in health insurance benefits if he took another job. Both vocational experts, Marquardt and Bennett, testified that Chalfant was capable of obtaining a job with a wage range similar to what he had earned before. Marquardt, however, questioned Chalfant's hireability. In his report he opined that even though Chalfant had the skills and present functional ability to earn more, that he would be hired by a new employer in a position paying equal to his skills with benefits was questionable because of his over-55 age and chronic medical conditions. Titan did not offer evidence of any specific job available to Chalfant which he could have discovered and for which he would have been qualified.

Though the jury may well have been sympathetic to Chalfant's concern with maintaining health insurance coverage in view of his age, that of his wife, and the health histories of both, the Court questions whether his concern excused him from further reasonable efforts to find more remunerative employment for which he was qualified by skill and physical ability. However, there are two prongs to the mitigation defense. Titan was also required to prove that there were suitable jobs available for Chalfant. The jury was entitled to credit Marquardt's opinion that Chalfant's age and health history diminished his hireability and, having done so, could have concluded that even had Chalfant made a

diligent effort to obtain substantially equivalent employment he would probably not have obtained such employment by the time of trial. Indeed, Titan's rejection of Chalfant's application because of his health history might have been seen by the jury as tending to prove Marquardt's point. The record thus does not compel the conclusion that as a matter of law Titan sustained its burden of proving Chalfant's damages should be reduced for failure to mitigate.

     6.  <u>Punitive Damages</u>

The jury returned a verdict of $100,000 for punitive damages. Titan contends the evidence was insufficient to submit the issue of punitive damages to the jury.[7] Titan has been down this road before. Relying on <u>Webner v. Titan Dist., Inc.</u>, 267 F.3d 828 (8th Cir. 2001) and <u>Ollie</u>, <u>supra</u>, it argues it did not act maliciously or in reckless disregard of Chalfant's federally protected rights because it "interpreted Dr. Sciorrota's report as finding that Chalfant had failed his physical for the position Chalfant was applying for" and also did not hire Chalfant because of the elimination of the second shift.

The plaintiff in an ADA action may obtain punitive damages upon a showing that defendant discriminated against him "with malice or with reckless indifference to [his] federally protected rights. . . ." 42 U.S.C. § 1981a(b)(1). In <u>Kolstad v. Am.</u>

---

[7] At trial punitive damages were submitted without objection.

23

Dental Ass'n, 527 U.S. 526 (1999), the Supreme Court construed the terms "malice" or "reckless indifference" to "pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Id. at 535.

In Webner the Eighth Circuit vacated an award of punitive damages in an ADA case, concluding that even though Webner's termination was culpable, Titan's stated reasons that his impairment precluded him from performing all but light duty tasks, it was fearful Webner would reinjure himself, and did not believe it had a job suited to his disability were "consistent with an employer acting to protect itself against the possible sporadic absence of an employee." 267 F.3d at 837. Ollie affirmed the district court's vacation of a punitive damage award in the belief the case was substantially similar to Webner. The Eighth Circuit viewed the evidence as demonstrating no more than "an unfortunately mistaken interpretation of a doctor's report, and [Titan's] attempt to protect itself and its potential employee from repeated health problems and absences." 336 F.3d at 689.

The problem with Titan's analogy to Webner and Ollie is that in this case Titan did not present the decisionmaker, Holley, to testify as to the reasons for the hiring decision, leaving the jury to infer those reasons from other evidence. Perhaps, similar to Ollie, Holley in good faith construed or misinterpreted Dr.

24

Sciorrota's report as indicating Chalfant had failed the physical examination for the second shift supervisor job as Titan seems to argue, but since that plainly is not what Dr. Sciorrota reported, absent an explanation from Holley the evidence is at least equally consistent with a finding that Titan knew Chalfant had in fact passed the physical, that flunking the physical was therefore not the true reason for the hiring decision, and was pretextual. The jury may have been led to a conclusion along these lines by Titan's dissembling until the final hour about who made the decision not to hire Chalfant and why. The relevant Titan employees had distanced themselves from the hiring decision and claimed not to know who made it until Luthin, in a 180-degree departure from her deposition testimony, not only identified Holley as the decisionmaker, but described the circumstances in which the decision was made. When Holley was not tendered by Titan to explain her decision, as she surely would have been had she had something positive to say, the jury had ample reason to question the honesty of any reason given by Titan for not hiring Chalfant.

According to Titan president William Campbell Holley was "chief legal counsel" for Titan. As such, the jury could believe she was thoroughly familiar with the laws against disability discrimination. The jury found Titan regarded Chalfant's physical impairments as substantially limiting his ability to work and was a motivating factor for not hiring him though he could have done

the job. Luthin's testimony puts the responsibility for the decision squarely on Holley. If the jury thus found Holley, a trained legal professional, was responsible for intentional discrimination against Chalfant in violation of his rights under the ADA and knowingly gave a false reason for the discharge, in the presence of her silence it is a short step to a finding that Titan acted in reckless disregard of Chalfant's rights under the ADA as discussed in <u>Kolstad</u>.

## THE FED. R. CIV. P. 59(e) MOTIONS PERTAINING TO FRONT PAY

Both sides ask the Court to revisit the issue of front pay. Titan contends the Court abused its discretion in awarding any front pay and the judgment should be altered or amended accordingly. Chalfant contends the Court awarded too little and the Court should alter or amend the judgment to increase the amount to a sum that would compensate Chalfant for six additional years at the rate of between $9,000 and $13,500 per year.

Relief under Rule 59(e) "is generally available only when a manifest error affects the 'correctness of the judgment.'" <u>Norman v. Ark. Dept. of Educ.</u>, 79 F.3d 748, 750 (8th Cir. 1996)(internal quotation from <u>Seshachalam v. Creighton Univ. Sch. of Medicine</u>, 545 F.2d 1147, 1147 (8th Cir. 1987), <u>cert. denied</u>, 433 U.S. 909 (1977)). The parties do not identify any error of fact or law, but ask that the Court reconsider. The Court continues to believe that front pay for a one-year period based on the difference between the

wages and benefits Chalfant would have earned at Titan and those he now earns at AMPCO is an appropriate equitable remedy which gives due regard both to the jury's verdict and Chalfant's earning capacity if he makes a reasonable effort to replace the income he has lost. No front pay would be inequitable, but six years of front pay (essentially to retirement) would be an unwarranted windfall.

The request to revisit the front pay issue will be denied.

### PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES AND EXPENSES

The above application [66, 67, 68, 79, 70, 88] is also before the Court. It is unresisted. Chalfant obtained a judgment in the amount of $178,750 on his ADA claim and Titan's post-trial motion will be denied. Consequently, Chalfant is the prevailing party for the purposes of 42 U.S.C. § 12205 and may recover a reasonable attorney fee, including litigation expenses and costs. His counsel achieved a good result and it is appropriate in this case both to award plaintiff fees as prevailing party and to use the "lodestar" method of calculation.

The lodestar method multiplies the number of hours reasonably expended by a reasonable hourly rate. Hanig v. Lee, 415 F.3d 822, 825 (8th Cir. 2005); Wheeler v. Missouri Highway & Transp. Comm'n, 348 F.3d 744, 754 (8th Cir. 2003); Fish v. St. Cloud State Univ., 295 F.3d 849, 851 (8th Cir. 2002); see Hensley v. Eckerhart, 461 U.S. 424, 434 (1983). A number of well-

established factors guide the Court's reasonableness inquiry, see Hensley, 461 U.S. at 430 n.3; Winter v. Cerro Gordo Cty. Conservation Bd., 925 F.2d 1069, 1074 n.8 (8th Cir. 1991), but the most important is the degree of success obtained. Wheeler, 348 F.3d at 754; Fish, 295 F.3d at 852 (citing Hensley, 461 U.S. at 436). Plaintiff, as the prevailing party, has the burden of establishing the hours expended and the rate claimed. Hensley, 461 U.S. at 437; Wheeler, 348 F.3d at 754.

With his most recent supplement, Chalfant claims an attorney fee totaling $47,134.50 plus costs in the amount of $5,173.24. Attorney Roger Kuhle performed the lions share of the services and was trial counsel; attorney John Haraldson assisted. Plaintiff seeks an hourly rate of $195 per hour for the services of Mr. Kuhle and $165 per hour for the services of Mr. Haraldson.

The rate should be in line with that "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Blum v. Stenson, 465 U.S. 886, 895 & n.11 (1984); see Fish, 295 F.3d at 851; Emery v. Hunt, 272 F.3d 1042, 1048 (8th Cir. 2001). An attorney's customary rate is some evidence of a reasonable rate, but it is not controlling. Moysis v. DTG Datanet, 278 F.3d 819, 828 (8th Cir. 2002). The district court may rely on its own experience and knowledge of the prevailing market rates. Haniq, 415 F.3d at 825.

The rates claimed here are well supported in the record. Both attorneys have significant experience in employment law and Mr. Kuhle's experience is lengthy. The Court finds the reasonable hourly rate for Mr. Kuhle is $195 per hour and for Mr. Haraldson is $165 per hour.

There has been no objection to the hours spent on this case and they appear reasonable for the tasks performed, which included appropriate discovery, contested summary judgment proceedings, and a three-day jury trial in which counsel for both sides demonstrated they had prepared carefully. Though Chalfant's ADA actual disability and ADEA claims were dismissed on summary judgment, the claims were closely related factually and the Court does not believe a reduction for a lack of success on these claims would be warranted.

There has been no objection to plaintiff's expenses in the total amount of $5,173.24, the largest of which were the witness fee for plaintiff's expert, Roger Marquardt, and costs of depositions.

The Court finds the reasonable attorney fee in this case to be $47,134.50, comprised of Mr. Kuhle's time of 223.3 hours at $195 per hour and Mr. Haraldson's time of 22 hours at $165 per hour. In addition, the Court finds the reasonable litigation expenses to which plaintiff is entitled to be $5,173.24.

**CONCLUSION**

For the reasons indicated, defendants' Renewed Motion for Judgment as a Matter of Law, or Motion for New Trial is **denied**. Plaintiff's Fed. R. Civ. P. 59(e) Motion for New Trial or to Amend Judgment on Issue of Front Pay is **denied**. Plaintiff's Motion for Award of Attorney Fees and Expenses is **granted** and attorney fees in the amount of $47,134.50 and litigation expenses in the amount of $5,173.24 are taxed against defendants.

IT IS SO ORDERED.

Dated this 30th day of December, 2005.


_____
ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE